IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AMBER GARTRELL, | CASE NO. 5:25-CV-00547-DAP |
| Plaintiff, | JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Amber Gartrell challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Mar. 20, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Gartrell applied for DIB on August 31, 2022, alleging she became disabled on October 14, 2021, due to fibromyalgia, back pain, osteoarthritis, vitamin D deficiency, insomnia, depression, obesity, migraines, degenerative arthritis, and polycystic ovarian syndrome. (Tr. 221-22, 255). After the claim was denied initially and on reconsideration, Ms. Gartrell requested a hearing before an ALJ. (Tr. 103, 114, 146-47). On January 22, 2024, Ms. Gartrell (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 48-92). On February 13, 2024, the ALJ determined Ms. Gartrell was not disabled. (Tr. 139). The Appeals Council denied Ms. Gartrell's

1

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Gartrell timely filed this action on March 20, 2025. (ECF #1).

FACTUAL BACKGROUND

I.      **Personal and Vocational Evidence**

Ms. Gartrell was 34 years old on her alleged onset date and 36 years old at the hearing. (*See* Tr. 93). She graduated from high school. (Tr. 256). She has past relevant work experience, including as an insurance agent, telemarketer, and sales floor manager. (Tr. 85).

II.     **Relevant Medical Evidence**

**2021.** In July, during a primary care visit at the Tuscarawas Health Center of Aultman Orrville (the health center) Ms. Gartrell complained of constant back and knee pain, among other things. (Tr. 575). Her provider, Keely Telquist, M.D., did not examine Ms. Gartrell but recommended ibuprofen for pain. (Tr. 576).

Ms. Gartrell returned to the health center in September and complained of continued low-back pain, especially with sitting or standing, and described associated difficulty with walking. (Tr. 578). Dr. Telquist prescribed prednisone for low-back pain and tizanidine HCL for muscle spasms and recommended back stretches.[1] (Tr. 580).

During a follow-up visit at the health center on November 2, Ms. Gartrell continued to complain of low-back pain. (Tr. 581). Dr. Telquist referred Ms. Gartrell to physical therapy to address low-back and knee pain. (Tr. 582).

---

[1]      Prednisone is a corticosteroid prescribed to treat a variety of conditions, including arthritis. *See Prednisone*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601102.html (last accessed Nov. 25, 2025). Tizanidine is a muscle relaxant. *See Tizanidine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601121.html (last accessed Nov. 25, 2025).

On November 9, Ms. Gartrell started physical therapy, where she reported increased pain with standing, sitting, lifting, and walking and endorsed difficulty with performing daily activities. (Tr. 593). The pain affects her ability to concentrate. (Tr. 594). On physical examination, she a slightly antalgic gait with decreased cadence. (*Id.*). Manual muscle testing revealed some diminished strength in the bilateral hips and knees; and Ms. Gartrell was tender to palpation of her right knee at the anteromedial joint line and in the lumbar spine. (*Id.*). She attended 10 sessions through December 9 and was discharged from physical therapy on December 15. (Tr. 588). On December 7, Ms. Gartrell reported she can perform activities of daily living but requires an occasional rest break to ease her back pain. (Tr. 589). The therapist emphasized Ms. Gartrell's improvement in leg strength but noted "her symptoms remain roughly the same." (*Id.*).

On December 9, Ms. Gartrell returned to the health center, reporting aching joints and continued low-back and knee pain. (Tr. 584). Dr. Telquist ordered lumbar x-rays that showed disc osteophytes in the lower thoracic spine, straightening of the lordosis, and minimal facet arthropathy in the lower lumbar spine. (Tr. 585-87).

**2022.** Ms. Gartrell met with orthopedist Kelsey O'Connor, D.O., in January for evaluation of lumbar pain. (Tr. 353). There, she described aching and squeezing pain in her low back that radiates to her hips and buttocks. (*Id.*). Heat, lying down, and sitting provide some relief while bending, standing, twisting, and walking aggravate her pain. (*Id.*). She endorsed difficulty with prolonged standing, walking, bending, twisting, stooping, performing housework, and lifting. (*Id.*). Dr. O'Connor observed Ms. Gartrell walk with a non-antalgic gait and noted intact muscle strength and stability in the lower extremities. (Tr. 354-55). She also documented limited range of motion in the spine and positive facet-load testing bilaterally. (*Id.*). Dr. O'Connor assessed Ms.

3

Gartrell with lumbar radiculopathy and ordered an MRI to look for neuroforaminal stenosis, disc bulges, and annular tears that might contribute to her back pain, especially with prolonged sitting. (Tr. 355). Dr. O'Connor explained that "weight loss and improving her load on the axial spine as well as knees and ankles will be of paramount importance" to address her orthopedic pain. (*Id.*). The lumbar MRI was unremarkable, revealing no significant stenosis. (Tr. 357-58).

Ms. Gartrell returned to Dr. O'Connor's office on in February, complaining of continued low-back and knee pain aggravated by excessive use, sitting, standing, and walking. (Tr. 349). Dr. O'Connor determined the MRI was "essentially normal" with "very trace disc bulges" at the L4-L5 and L5-S1 joints. (*Id.*). Ms. Gartrell endorsed discomfort with spinal range of motion testing, but the physical examination was otherwise normal. (Tr. 350-51).

In March, Ms. Gartrell treated with Brent Ungar, D.C., and complained of cramping, spasms, and numbness in the low back and upper gluteal regions, and neck spasms and tightness. (Tr. 486). Ms. Gartrell reported she must rest after walking short distances and has less pain when lying down. (*Id.*). On physical examination, Dr. Ungar noted "considerable" bilateral sternocleidomastoid muscle spasms, slow ambulation, and multiple positive spinal provocation tests. (Tr. 486-87). Ms. Gartrell had diminished cervical and lumbar range of motion and endorsed cervical, thoracic, lumbar, and sacral pain. (Tr. 487). Imaging of Ms. Gartrell's spine revealed mild loss of disc height with anterior spurring at the C6-C7 joint, mild uncovertebral arthrosis at the C5-C6 joint on the left, and moderate loss of disc height at the L5-S1 joint. (Tr. 484-85). She received 21 chiropractic treatments between March 3 and July 25. (Tr. 489-509).

4

On March 16, Ms. Gartrell returned to the health center complaining of "pain all over." (Tr. 596). Dr. Telquist recommended Ms. Gartrell follow up in six weeks to reassess her low-back pain. (Tr. 597).

An MRI of Ms. Gartrell's lumbar spine performed March 17 at Dr. Ungar's request showed:

- T11/T12: moderate loss of disc height with desiccation and anterolateral spondylosis with type II Modic changes without bulging, spurring, or disc herniation.
- T12/L1: early anterior spondylosis, normal disc height without bulging, spurring, or disc herniation.
- L1/L2: early anterior spondylosis, preserved disc height without bulging, spurring, or disc herniation.
- L4/L5: very mild left-sided facet arthropathy with mild thickening of the ligamentum flavum on the left and a physiologic amount of fluid in the right facet joint.

(Tr. 599). The interpreting radiologist determined Ms. Gartrell has moderate disc degeneration at the T11/T12 level with early anterolateral spondylosis at the T12/L1 and L1/L2 levels, and very mild left-sided facet arthrosis at the L4/L5 level. (Tr. 600).

Ms. Gartrell returned to the health center in May complaining of "pain all over." (Tr. 621). Dr. Telquist assessed Ms. Gartrell with fibromyalgia, prescribed Lyrica,[2] referred her to physical therapy to address back pain, and ordered blood work to investigate her knee pain. (Tr. 622).

When Ms. Gartrell returned the next month, she reported that tizanidine relieved some pain, but Lyrica was not helpful. (Tr. 646). Dr. Telquist increased the Lyrica dose. (Tr. 647).

---

[2] Lyrica is a brand name for pregabalin, an anti-convulsant used to treat neuropathic pain. *See Pregabalin, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a605045.html (last accessed Nov. 25, 2025).

On June 28, Ms. Gartrell met with rheumatologist Johnny Su, M.D., and reported pain in the bilateral shoulder girdle, lower arms, hips/buttocks, upper and lower legs, neck, and upper and lower back. (Tr. 679). The physical examination showed a normal gait; full range of motion in the neck, spine, elbows, and wrists; full strength and range of motion in the shoulders, hips, knees, and ankles; and intact grip strength and normal hand grasp. (Tr. 679-80). Dr. Su did not observe any deformity, swelling, or tenderness to palpation. (*Id.*). He ordered blood work and knee x-rays. (Tr. 681).

Bilateral knee x-rays showed mild-to-moderate tricompartmental joint space narrowing, mild degenerative joint change, lateral patellar margin spurring, and mild anterior soft tissue swelling in the left knee. (Tr. 409). Right knee x-rays showed moderate-to-severe medial compartment joint space narrowing and mild lateral and patellofemoral joint space narrowing. (*Id.*).

Ms. Gartrell returned to Dr. Su's office in August, where a physical examination showed normal gait; full range of motion in the neck, spine, elbows, and wrists; full strength and range of motion in the shoulders, hips, knees, and ankles; and intact grip strength and normal hand grasp. (Tr. 675-76). She did not have any deformity, swelling, or tenderness to palpation. (*Id.*). Dr. Su prescribed meloxicam[3] for joint and muscle pain and ordered lab work and imaging. (Tr. 677). In December, Dr. Su prescribed celecoxib[4] for pain. (Tr. 706).

---

[3]       Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, tenderness, swelling, and stiffness caused by arthritis. *See Meloxicam*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601242.html (last accessed Nov. 25, 2025).

[4]       Celecoxib is a NSAID (like meloxicam) used for the same purpose, though it works differently. *See Celecoxib*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a699022.html (last accessed Nov. 25, 2025).

6

X-rays of the feet showed small plantar calcaneal enthesophytes bilaterally and soft tissue swelling in the right forefoot. (Tr. 682-83). A pelvic x-ray revealed normal hip alignment and symmetric sacroiliac joints. (Tr. 684). Bilateral hand x-rays showed negative ulnar variances, which caused displacement of the carpal bones, more prominent in the left than right. (Tr. 716-17). Lumbar spine x-rays showed mild facet arthropathy. (Tr. 718).

**2023.** On May 18, Ms. Gartrell met with rheumatologist Inderprit Singh, M.D., and reported generalized body pain lasting for two years. (Tr. 770). She described diffuse joint pain, morning stiffness lasting 30 minutes to an hour, and fatigue. (*Id.*). The physical examination showed decreased range of motion in her cervical and lumbar spine, diffuse myofascial tenderness, crepitus in the knees, and tender points in the suboccipital, low cervical, trapezius, supraspinatus, greater trochanteric, second rib, lateral epicondylar, and knee medial fat pad areas. (Tr. 771). Dr. Singh recommended Ms. Gartrell taper off Lyrica and begin taking gabapentin.[5] (Tr. 774). Cervical x-rays from June were unremarkable. (Tr. 944).

When Ms. Gartrell returned to Dr. Singh's office in August, she reported continued low-back, buttock, and knee pain, constant left-sided neck pain, and worsened fatigue. (Tr. 979, 981). She also told the doctor that gabapentin works somewhat better than Lyrica. (Tr. 979). The physical examination showed decreased lumbar range of motion and knee crepitus. (Tr. 980). Dr. Singh concluded Ms. Gartrell has severe fibromyalgia and osteoarthritis of the knees, both of which are complicated by her obesity. (Tr. 981-82). He also noted that Ms. Gartrell must lose weight before treating her knees. (Tr. 982).

---

[5]      Gabapentin is an anticonvulsant (like Lyrica) that is also used to treat neuropathic pain. *See Gabapentin*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a694007.html (last accessed Nov. 25, 2025).

### III.    Other Relevant Evidence

As part of her application for benefits, Ms. Gartrell described how her medical impairments limit her ability to work in an Adult Function Report. (Tr. 267-75). She also testified about her impairments at the administrative hearing. (Tr. 70-84).

Ms. Gartrell has fibromyalgia and arthritis, both of which cause pain. (Tr. 267). Her worst pain is in her knees, hips, and low-back, and is so severe that she cannot sit longer than 20 minutes (Tr. 70) or stand longer than 5 to 10 minutes before needing to rest (Tr. 80), and she must lie down several times a day to alleviate her pain (Tr. 82). Ms. Gartrell cannot lift anything over ten pounds without extreme low-back and knee pain. (Tr. 267). Pain keeps her awake at night and she feels tired during the day. (Tr. 268). She has morning stiffness in her neck, back, knees, feet, and hands for more than an hour after she wakes. (Tr. 268). Ms. Gartrell wears a knee brace and uses a cane for ambulation when leaving the house. (Tr. 273). She also uses the cane at home to help rise from a seated position. (*Id.*). Gabapentin eases her knee, hip, and back pain "a little" (Tr. 74), but her medications also cause "extreme fatigue" (Tr. 267). Occasionally, she spends the day in bed because she has no energy. (Tr. 275).

Ms. Gartrell can drive short distances but her back, hips, and knees begin to cramp and ache after about twenty minutes in the driver's seat. (Tr. 270). She asks her husband or sister to drive when she cannot. (*Id.*; *see also* Tr. 55). Ms. Gartrell does most of her shopping online. (Tr. 270). Going to the store takes a few hours because she walks slow and must take breaks to ease her back, knee, and foot pain. (*Id.*). She can shower, feed herself, and use the toilet independently but her husband helps shave her legs and dress on occasion. (Tr. 268). When she drops something

8

on the floor, she usually asks her husband to pick it up because she cannot bend at the knees or the waist. (Tr. 82).

Ms. Gartrell cooks simple meals about once a week. (Tr. 269). Typically, her husband buys pre-made items or picks up takeout meals. (*Id.*). She can complete household chores but does so very slowly. (*Id.*). For instance, doing dishes may take the entire day because she can wash just a few dishes before she must lie down for half-hour to an hour to ease her pain. (Tr. 275). Carrying laundry is painful and vacuuming and mopping cause cramping. (*Id.*).

Ms. Gartrell used to enjoy reading, playing video games, taking her dogs to the park, swimming, visiting haunted houses, crafting, traveling, and painting. (Tr. 271). Now she only watches television and reads on occasion. (*Id.*). She cannot paint or play video games because those activities cause neck and back pain and cramping in her hands. (*Id.*). Ms. Gartrell regularly attends doctor's appointments and swam once a week at the YMCA when she could afford the membership. (*Id.*, *see also* Tr. 53-54). She goes out with her sister once or twice a month but is in too much pain to spend time with friends. (Tr. 271).

The VE classified Ms. Gartrell's past relevant work as a sales floor manager, insurance agent, telemarketer, department store manager, and storefront sales associate. (Tr. 85-86). The VE testified a person of Ms. Gartrell's age, education, and experience could not perform her past relevant work but could perform sedentary jobs (telephone information clerk, document preparer, addresser) if subject to the ALJ's stated restrictions. (Tr. 86-88). The VE opined a person would be precluded from competitive employment if the person needed a ten-minute break every hour. (Tr. 88-89). A person limited to occasional grasping, fingering, and reaching with the upper extremities and restricted from any stooping, kneeling, crouching, crawling, and squatting cannot

9

perform any sedentary work. (Tr. 90). Finally, the VE stated employers tolerate an employee being off task no more than 10% of the workday and absent once a month. (Tr. 89).

## IV.    Medical Opinions and Prior Administrative Medical Findings

On May 23, 2022, Ms. Gartrell underwent a functional capacity evaluation (FCE) with an occupational therapist to determine her functional abilities and limitations. (Tr. 626). Before the evaluation, Ms. Gartrell reported increased back pain when standing or sitting for an extended time. (*Id.*). At the time, Ms. Gartrell worked from home as a health insurance agent. (Tr. 627). She reported working in one-hour shifts because sitting causes increased pain. (*Id.*). The occupational therapist, Jessica Duke, MOT, OTR/L, documented some of Ms. Gartrell's statements about what she can and cannot do:

> She has increased pain with driving. She can drive for 20 minutes before having increased back pain. She can sit for a maximum of 20-30 minutes before readjusting herself, but after 1 hour she needs to lie down. She stated that when she stands the pain radiates down her legs and some of her skin becomes numb to the touch. She stated that her knees hurt when sitting and standing. She stated that she can walk continuously from the Walmart parking lot towards the back of the store. She stated she cannot stand to do all the dishes. She stated she cannot do normal household chores without rest breaks. She cannot walk her dog on a leash anymore and has to put him on a lead outside her door when he needs to use the bathroom. She cannot carry his dog food but can carry a gallon of milk if needed.

(Tr. 627) (cleaned up). Tests included the Purdue Pegboard; manual muscle testing; grip strength; manual dexterity testing; postural capacities; lift, carry, push, and pull capacities; and gait testing. (Tr. 637-43).

During pegboard testing, the therapist observed "some rushing behaviors, increased work posture, and voiced frustration with error." (Tr. 637). According to Ms. Duke, those observations show Ms. Gartrell gave full physical effort during the test. (*Id.*). She concluded Ms. Gartrell's fine

motor coordination was slightly diminished bilaterally. (*Id.*). Ms. Gartrell reported increased back pain and spasming when leaning forward for forward reaching. (*Id.*).

Manual muscle testing was largely normal with some diminished left-knee flexion. (Tr. 638). During grip testing, Ms. Duke observed fine muscle tremors and accessory muscle recruitment indicating full physical effort. (*Id.*). Ms. Gartrell reported some hand-joint pain with repetitive gripping. (*Id.*).

On manual dexterity testing performed while standing, Ms. Gartrell scored below the first percentile (the lowest). (Tr. 639). During the test, Ms. Duke observed "voiced frustration with error and competitive stance," "demonstrated increased trunk flexion with increased standing time and immediately sat down after testing." (*Id.*). Ms. Gartrell reported increased low-back, hip, and knee pain after standing. (*Id.*).

During postural testing, Ms. Gartrell reported increased back and knee pain with stooping, crouching, and going down steps. (Tr. 641). She could not lower herself to a full squat position. (*Id.*). Based on the results of postural testing, Ms. Duke determined Ms. Gartrell can occasionally grasp and finger with both upper extremities and occasionally reach forward less than 18 inches but she can never climb, stoop, kneel, crouch, crawl, squat, navigate a flight of stairs, or reach forward greater than 18 inches. (Tr. 640-41). Ms. Duke also found Ms. Gartrell limited in pushing, pulling, lifting, and carrying "due to complaints of lower back pain, knee pain, and hip pain bilaterally." (Tr. 642).

During a walking test, Ms. Gartrell began to hold her lower back (a sign of a painful gait) after one minute and twenty-two seconds. (Tr. 642). She walked for three minutes and thirty-two seconds before she needed to sit down due to pain. (Tr. 643). Ms. Duke also observed Ms. Gartrell

11

sit for forty-four minutes before standing to stretch her back and stand for an average of seven minutes before sitting down due to knee and back pain. (Tr. 642). Based on the test results, Ms. Duke opined Ms. Gartrell cannot work because pain limits her abilities to sit, stand, walk, lift, pull, or carry. (Tr. 643).

On January 12, 2023, Ms. Gartrell attended a consultative physical evaluation with nurse practitioner Mary Ann Hayden, APRN, CNP. (Tr. 728-37). At the evaluation, Ms. Gartrell claimed disability due to fibromyalgia, degenerative arthritis in the knees, lower back pain, migraines, fatigue, hypertension, depression, arthritis in the neck and back, and polycystic ovarian syndrome. (*Id.*). She reported having difficulty with stairs and using a cane for ambulation. (Tr. 729). She can sit for 30-45 minutes before her lower back begins to cramp, stand for 5 minutes before she has knee and lower back pain, and walk for "a very short" time before knee and back pain returns. (*Id.*). The physical examination showed bilateral knee crepitus with range of motion testing and tenderness of the shoulders, sides, legs, and calves. (Tr. 730-31). Ms. Gartrell displayed diminished strength in her knees, ankles, hallux, and toes, but intact grip strength. (Tr. 733-34). She had some diminished range of motion in the spine, shoulders, and elbows. (Tr. 735). Nurse Hayden observed a slow gait and noted Ms. Gartrell could stand up from a chair with ease but (1) could not squat and rise with ease; (2) could not walk on her heels or toes; (3) had issues with tandem gait; and (4) could not hop or stand on one foot. (Tr. 731). Nurse Hayden concluded that Ms. Gartrell has severe limitations with standing and walking due to back, leg, and knee pain; significant limitations with lifting and carrying weight; and an unspecified degree of limitation with bending, stooping, crouching, and squatting. (Tr. 732).

12

On February 6, 2023, state agency medical consultant Gail Mutchler, M.D., reviewed the available medical record and assessed Ms. Gartrell's residual functional capacity (RFC). (Tr. 98-99). Citing Ms. Gartrell's morbid obesity, migraines, low-back and neck pain (supported by mild x-ray findings and overlapping fibromyalgia), and degenerative knee changes, Dr. Mutchler determined Ms. Gartrell can lift and carry 20 pounds occasionally and 10 pounds frequently; sit and walk for a total of 4 hours and sit for a total of 6 hours in an 8-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to extreme temperatures, humidity, noise, and vibrations and all exposure to hazards such as dangerous machinery and unprotected heights. (*Id.*).

On May 2, 2023, state agency medical consultant Jeffrey Faludi, M.D., reviewed additional medical records and largely adopted Dr. Mutchler's findings except he found Ms. Gartrell could lift and carry 10 pounds occasionally (as opposed to 20) and less than 10 pounds frequently, sit and walk for a total of 2 hours (as opposed to 4) in an 8-hour workday, and frequently balance (as opposed to occasionally). (Tr. 109-10).

### STANDARD FOR DISABILITY

Eligibility for benefits is based on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process found at 20 C.F.R. § 404.1520 to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Gartrell had not engaged in substantial gainful activity since October 14, 2021, the alleged onset date. (Tr. 12). At Step Two, the ALJ identified "degenerative disc disease (DDD) of the cervical spine and lumbar spine, osteoarthritis of the bilateral knees, fibromyalgia, migraines, obesity, and depressive disorder" as severe impairments. (Tr. 13). At Step Three, the ALJ found Ms. Gartrell's impairments did not meet the requirements of any listed impairment. (Tr. 13-17).

At Step Four, the ALJ determined Ms. Gartrell's RFC as follows:

14

> After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform sedentary work,[6] as defined in 20 CFR 404.1567(a), except that she requires the use of a cane for ambulating, and she is further limited in the following nonexertional respects: can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; occasionally balance, stoop, crouch, kneel, and crawl; never work at unprotected heights or around moving mechanical parts; can have no more than frequent exposure to extreme cold, extreme heat, vibration, or loud noise in the environment; can perform simple, routine, and repetitive tasks but not at a production rate pace; and can respond appropriately to few changes in a routine work setting with such changes explained in advance.

(Tr. 17). At Step Five, the ALJ found Ms. Gartrell could perform work in the national economy as a telephone information clerk, document preparer, and addresser. (Tr. 34). Thus, the ALJ concluded Ms. Gartrell was not disabled. (Tr. 35).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence

---

[6] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d

16

875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000,

2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Ms. Gartrell argues the ALJ did not properly consider Ms. Duke's opinion under 20 C.F.R.

§ 404.1520c. (ECF #10 at PageID 1130). Ms. Gartrell does not argue the ALJ did not address the

necessary persuasiveness factors in evaluating Ms. Duke's opinion; rather she argues the reasons

the ALJ discounted the opinion—because the record did not support her findings and the opinion

was based on subjective reports of pain—are simply wrong. (*Id.* at PageID 1131) ("contrary to the

ALJ's assertion, the medical record does provide ample support and consistency of her medical

opinion"). The Commissioner responds that the ALJ sufficiently evaluated the supportability and

consistency of Ms. Duke's opinion and explained why it was not persuasive. (ECF #13 at PageID

1146).

As part of the RFC assessment, the ALJ must review all medical opinions and prior

administrative findings and explain how persuasive he finds them. *See* 20 C.F.R. § 404.1520c(b);

*see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five

factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship

with the claimant, including length of treatment relationship, frequency of examinations, purpose

of the treatment relationship, and examining relationship; (4) the source's specialization; and (5)

any other factors that tend to support or contradict a medical opinion. 20 C.F.R.

§ 404.1520c(c)(1)-(5). The regulations require the ALJ to "explain how [he] considered the

supportability and consistency factors for a medical source's medical opinions," the two most

17

important factors. *See id.* § 404.1520c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation" and consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5853, 2017 WL 168819 (Jan. 18, 2017).

The ALJ's explanation should "generally include[] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* at 5859. The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability and substantial evidence supports the discussion, the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

Here, the ALJ explained why Ms. Duke's opinion was not persuasive:

On May 23, 2022, Ms. Gartrell attended a functional capacity evaluation conducted by Jessica Duke, O.T.R./L., in relation to securing payments of short-term disability insurance benefits—*i.e.*, and successfully so in light of the above-discussed taxable payments shown in later year 2022 continuing into 1st-quarter 2023 (Ex. 2F/1-2). She presented to Ms. Duke with generalized fibromyalgia joint pains including her hips, low back, and neck, and with bilateral knee pain; rated this pain as partially 6/10 (moderate) but up to 8/10 (per rating system as "nearing hospitalization"); and asserted that she can sit for 20-30 minutes comfortably at the most, noting there that sitting for one-hour period would then require her to lie down due to the increased pain, that she cannot stand to wash a load of dishes, and that she can walk from the parking lot to the back of a large store (Walmart) but cannot walk her dog any more.

In concluding the May 2022 FCE, Ms. Duke stated that Ms. Gartrell would be unable to work an eight-hour job or even a four-hour workday even at a sedentary work level,

18

primarily due to pain in her knees and lower back that increased on FCE activities, but also considering presentations with upper and lower extremity weakness, weakness in grip strength, and presented limited sitting, standing, and walking. Adding specificity, Ms. Duke concluded that Ms. Gartrell is limited to lifting and carrying at most 15-20 pounds and cannot lift or carry any weight on an occasional frequency in a workday; can push only 9 pounds and can do no pulling of any weight (0 pounds); can sit for only 44 continuous minutes in a standard upright "office" chair, and in turn needs to frequently change positions between sitting and standing to manage pain; can only stand for seven continuous minutes; and can walk for three and one-half minutes before needing to sit, but not even 90 seconds before showing features of increased back pain and knee pain. Furthermore, Ms. Duke concluded that the FCE showed no (never) abilities to climb, stoop, crouch, kneel, crawl, or use stairs; no abilities to reach above shoulder height or forward/in front of the body for more than 18 inches of distance, and can only occasionally reach forward for 18 inches or less of distance; and can only occasionally perform grasping and fingering (fine motor coordination) tasks during an eight-hour workday.

Ms. Duke's conclusions from the May 2022 FCE do constitute a medical opinion under 20 C.F.R. 404.1513(a)(2), but they are not persuasive under 20 C.F.R. 404.1520c(b) because they are not entirely supported by her one-time observations, and in many regards cite the claimant's subjective reports, and because they are not consistent with the objective medical evidence from physicians of record or with the other medical factors discussed above, including the altogether conservative and partially beneficial treatments for managing pain both through and after she had evaluated the claimant. For instance, her observations of limited standing and walking time, with the latter unsupported ("no equipment") but with antalgic/painful pattern and wide base of support, and notations of audible and palpable crepitus in the knees and 3/5 rated strength in the lower leg muscles do partially support in the general her opinion for significantly reduced standing and walking abilities. But the sitting ability for 45 minutes does not persuasively support her broad statement that the claimant could not sit for even four total hours in a workday, and instead largely cites the claimant's own statements as support for this stated inability to sustain performance of even sedentary work for an eight-hour day.

I also note that Ms. Duke's offered support for total inabilities to reach overhead and to longer distance in front of the body, to stoop and to crouch, and to kneel and to climb stairs largely cite her report of increased back pain on stooping and partial squatting, and thus deeming her unsafe to test kneeling and stair climbing. Yet, this does not appear to take into account grossly full ranges of motion in the lower extremities, and it is not consistent with the other medical evidence showing only modest reduction in forward flexion and other ranges of motion at the dorsolumbar spine, and 4/5 to 5/5 strength in the lower extremities graded by physicians. Moreover, while considering reported increases in back pain and muscle spasms on pegboard testing for the hands, Ms. Duke's opinion for only occasional handling,

19

reaching, and other manipulative abilities is not well supported because it does not account for her observation that the claimant rushed through this activity, because it is not consistent with her assessment of average to only "slightly" below normal limits of fine motor coordination abilities and noting that the claimant did not drop any pieces, and because it is incongruent with her recording of "grossly" full limits of bilateral upper extremity joint ranges of motion and 4+/5 wrist strength to 4/5 shoulder and forearm strength. The subsequent objective findings from the January 2023 consultative examination and from rheumatology consults with Dr. Singh are not consistent with her opinions for only occasional manipulative abilities in most respects, and instead show no significant functional limitations in reaching, handling, fingering, or feeling.

Lastly, the May 2022 FCE conclusions are not persuasive for the claimant's maximum abilities in exertional and other physical nonexertional activities because they are not proportionate with the conservative treatment received through it, which included a mere one-month course of partially beneficial physical therapy and a few months of chiropractic manipulation sessions, taking prescribed medications through primary care practice group, and doing home-based pool therapy exercises once or twice a week. They are not consistent with the later medical evidence in 2022 and 2023 for improving pain with the addition of gabapentin medication to previously prescribed muscle relaxant, Cymbalta, and "NSAID" medications, but again without any pursuit of advancing treatments through primary care or rheumatology specialists.

(Tr. 27-29) (cleaned up).

At length, the ALJ addressed the supportability of Ms. Duke's opinion, noting that some of her observations of limited standing and walking, in combination with evidence of knee abnormality (crepitus and decreased strength in the lower leg muscles), partially supported the limitations concerning reduced standing and walking capabilities. (Tr. 28). Consequently, and in consideration of her fibromyalgia and osteoarthritis, the knee x-rays, and other clinical findings, the ALJ limited Ms. Gartrell to sedentary work. (Tr. 21, 23). The ALJ found that Ms. Duke's one-time observation of Ms. Gartrell sitting for 45 minutes before stretching her back and Ms. Gartrell's contemporaneous reports pain do not support the broader opinion that she cannot sit for even four hours total in an eight-hour workday. (Tr. 28).

20

The ALJ also discussed the consistency of Ms. Duke's opinion. The ALJ emphasized the incongruency between the opined manipulative limitations (occasional grasping and fine motor control tasks) with the results of the Purdue Pegboard test (fine motor coordination assessed at "slightly below normal" bilaterally), and the clinical findings showing grossly full range of motion and intact strength in the upper extremities. (Tr. 28-29). Those same limitations were inconsistent with the clinical findings documented in Nurse Hayden's consultative examination report and Dr. Singh's treatment records, both of which "show no significant functional limitations in reaching, handling, fingering, or feeling." (Tr. 29). On the postural limitations, the ALJ emphasized that Ms. Duke's own clinical findings and findings from other medical records illustrate "grossly full range of motion" and normal or slightly diminished lower-extremity muscle strength, inconsistent with the therapist's opinion that Ms. Gartrell has no ability to reach, stoop, crouch, kneel, or climb stairs. (Tr. 28). The ALJ's extensive discussion of both the supportability and the consistency of Ms. Duke's opinion meets the burden of articulating how the ALJ evaluated the persuasiveness of the opinion and cited substantial evidence in doing so.

Ms. Gartrell first asserts that Ms. Duke's observations during the FCE support her conclusions. (ECF #10 at PageID 1134). For instance, "Ms. Duke observed her inability to sit or stand for extended periods," noting she could not "walk more than three and a half minutes, sit for more than 44 minutes, and stand for more than 9 minutes, which were supported by [Ms. Duke's] observations of Ms. Gartrell shifting, trying to find comfortable positions, reporting pain, and immediately sitting after doing a standing test." (Id.). Ms. Gartrell also argues Ms. Duke's opined restrictions are consistent with clinical findings from 2021 documenting lumbar tenderness and diminished extension, a 2021 x-ray showing mild lumbar facet arthropathy and

21

disc osteophytes in the thoracic spine, and a clinical finding of decreased lumbar range of motion in 2023. (*Id.* at PageID 1135).

Again, Ms. Gartrell does not claim the ALJ failed to apply the factors of supportability and consistency. Rather, she extensively argues the opinion is supported by Ms. Duke's observations and is consistent with other evidence in the record, contrary to the ALJ's conclusion. But even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. To show a lack of substantial evidence, Ms. Gartrell "must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene ex rel. Greene v. Astrue*, No. 1:10-cv-414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). A reasoning mind could accept the ALJ's conclusion that some of the opined restrictions were neither supported by Ms. Duke's clinical findings and observations nor consistent with the other evidence of record.

Ms. Gartrell also contends the ALJ erred by discounting Ms. Duke's opinion because the opined restrictions were based only on Ms. Gartrell's contemporaneously reported pain. (ECF #10 at PageID 1134). She argues her reported pain, documented during FCE testing, was but one factor Ms. Duke considered in reaching her conclusions, and the other factors, including her observed maximum sitting, standing, and walking times during the assessment, support Ms. Duke's conclusions. (*Id.*). But the ALJ did not find Ms. Duke's opinion unpersuasive solely because it relied on Ms. Gartrell's self-reported pain. The ALJ also noted Ms. Duke did not test certain postural abilities, like kneeling, because Ms. Gartrell reported increased pain with other postural testing. (Tr. 28). And the ALJ discussed how Ms. Duke's opined limitations were not

supported by and inconsistent with Ms. Duke's clinical findings, including grossly full range of motion in the lower extremities, and other clinical findings across the medical record finding intact strength and range of motion. (*Id.*).

Because the ALJ properly evaluated the medical opinion using the supportability and consistency factors and his conclusions are supported by substantial evidence, I decline to recommend remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's denial of disability insurance benefits.

Dated: November 26, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v.*

*Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

24